## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RHONDA WHITE, | ) | |
| as successor to Carl R. White, | ) | |
| Deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-cv-3293 |
| | ) | |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Rhonda White, as successor to her late husband Carl R. White (White), deceased, appeals from the denial of White's application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423. This appeal is brought pursuant to 42 U.S.C. § 405(g).

White applied for Disability Benefits on September 28, 2015. Certified Transcript of Proceedings before the Social Security Administration (d/e 13 (R.) 81.  White filed a previous application for

---

[1] Andrew Saul is now the Commissioner of Social Security.  He is automatically substituted in as the proper party Defendant in this case.  Fed. R. Civ. P. 25(d).

Disability Benefits. The prior application was denied on May 10, 2012. R. 266. In the current application, White alleged that he became disabled on April 30, 2011 ("Onset Date"). R. 67, 83. 206.[2] The last date he was insured for Disability Benefits was June 30, 2013 ("Date Last Insured" or "DLI"). White was required to establish that he was disabled on or before the Date Last Insured. 20 C.F.R. § 404.320(b)(2)

After his Date Last Insured, White suffered three strokes in 2014 and 2015. His wife Rhonda White was appointed his guardian on January 19, 2016. R. 33, 175. White died on January 19, 2019. Death Certificate (d/e 10). Rhonda White was substituted in as the proper party plaintiff in this case. Text Order entered March 13, 2019; Fed. R. Civ. P. 25(a)(1). Rhonda White filed a Motion for Summary Judgment (d/e 15). The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 18). For the reasons set forth below, the Decision of the Commissioner is affirmed.

## STATEMENT OF FACTS

White was born on November 7, 1955. He completed high school. He previously worked as a self-employed construction contractor. R. 216.

---

[2] White originally alleged that he became disabled on January 1, 2009. White amended the alleged Onset Date to April 30, 2011. R. 81, 206.

He last worked in 2008.  R. 205, 269.  He stopped working because of the economic downturn in 2008.  R. 216.  On or before June 30, 2013, White suffered from diabetes mellitus, obstructive sleep apnea, obesity, peripheral neuropathy, and kidney disease status post renal cancer and partial left nephrectomy.[3]  R. 67, 81, 83-84, 87, 206.  On February 18, 2005, White underwent a left partial nephrectomy for low-grade conventional clear cell carcinoma of the left kidney.  R. 894.

On January 22, 2008, Carl White had blood tests.  The results showed blood urea nitrogen level (BUN) at 33, creatinine at 1.48, and estimated glomerular filtration rate (GFR) at 50.  R. 380.  Normal BUN is 9-21, normal creatinine is 0.7-1.3, and normal GFR is 60-120.  E.g., R. 571, 573.

On February 14, 2008, White saw Dr. Andrew Bourne, M.D., for a follow up on his cancer surgery.  R. 894-95.  On examination, White was obese.  Otherwise, he was in no acute distress, alert, and oriented.  White's lab test results showed glucose at 118, BUN at 21 and creatinine at 1.3.  Normal glucose is  75-110.  E.g., R. 573.  Otherwise, his liver functions were within normal limits.  X-rays and ultrasound showed cardiomegaly but

---

[3] Nephrectomy is the removal of the kidney.  Dorland's Illustrated Medical Dictionary(32nd ed. 2012) (Dorland's), at 1240.

no other remarkable results.[4]  Dr. Bourne concluded that White had a

"good oncologic outcome."  Dr. Bourne planned to see White in a year.  R.

894.

On February 27, 2008, White saw Dr. Amit S. Date, M.D., for a follow

up appointment after a sleep study.  R. 893.  The study showed severe

sleep apnea.  The study also showed that White significantly improved with

the use of a BiPAP machine while sleeping.[5]  White reported that after

sleeping with the BiPAP machine, he was not as tired during the day and

his mood improved.  White decided to use the BiPAP machine and to lose

weight.  On examination, White was 5 feet 10 inches tall and weighed 332

pounds, with a body mass index (BMI) of 44.5.  R. 893.

On November 4, 2008, White had blood tests.  The results showed

glucose at 68, potassium at 4.8, BUN at 25, creatinine at 1.5, and GFR at

52.  R. 380.

On February 19, 2009, White had blood tests.  The results showed

glucose at 121, potassium at 4.4, BUN at 28, creatinine at 1.56, and GFR

at 47.  R. 365-66.

---

[4] Cardiomegaly is an enlarged heart.  Dorland's, at 295.
[5] BiPAP stands for "bilevel positive airway pressure."  "What is BiPap?",
https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/bipap, visited on October 31,
2019.

On February 18, 2010, White had blood tests. The results showed glucose at 147, potassium at 4.4, BUN at 26, creatinine at 1.3, and GFR at 58. R. 369.

On June 10, 2010, White's lab results showed an A1C diabetes test result of 9.5. A normal A1C is 4.2 to 6.5. R. 373.

On March 31, 2011, White saw Dr. William Yu, M.D., for his annual physical examination. R. 540-42. White complained of abdominal pain in the right upper quadrant radiating to the left flank. R. 540. White weighed 335 pounds with a BMI of 48.07. On examination, White had an abnormal gait, but normal movement of his extremities and normal muscle tone and strength. R. 541. Blood test results showed glucose at 365, potassium at 5.5, BUN at 34, creatinine at 2.53, and GFR at 34. R. 574, 580. Dr. Yu referred White for an ultrasound for his abdominal pain. R.542.

On April 29, 2011, White had his gallbladder removed. R. 392. Blood tests showed glucose at 350, BUN at 48, creatinine at 3.9, and potassium at 7.0. The results indicated that the potassium level was critical. R. 397. When White arrived at home after the gallbladder surgery, he felt weakness in his legs and almost fell. R. 393.

The next day, on April 30, 2011, White was admitted to Memorial Medical Center in Springfield, Illinois (Memorial), for acute renal failure. R.

393. Blood tests showed potassium at 7.6, glucose at 134, BUN at 52, and creatinine at 4.0. R. 466. White saw Dr. Pradeep Mehta, M.D., on a consult on his acute renal failure. Dr. Mehta placed White on dialysis. R. 404-05. After dialysis, on May 1, 2011, White's potassium dropped to 4.9 in normal ranges; BUN dropped to 29; and creatinine dropped to 2.8. White's glucose was 134. R. 467. On May 2, 2011, White's potassium stayed normal at 4.5; his glucose was 164, his BUN was 37, and his creatinine was 3.1. R. 468. On May 3, 2011, White's potassium stayed normal at 4.4, his glucose was 203, his BUN was 31, and his creatinine was 2,8. R. 469. White was taken off his diabetes medications and started on insulin. He was also put on blood pressure medication. He was discharged in stable condition on May 3, 2011. R. 393.

On May 20, 2011, White saw Dr. Yu for follow up after hospitalization and to repeat blood tests. R. 535. The blood test results showed potassium at 5.1, glucose at 246, BUN at 41, creatinine at 2.85, and GFR at 23. R. 571, 573. On examination, White had normal strength, sensation, gait, and movement of extremities. Dr. Yu started White on daily insulin and sent the lab results to Dr. Lawrence Smith, M.D., at the Central Illinois Kidney & Dialysis Association in Springfield, Illinois. R. 539; see R. 498.

On May 26, 2011, White saw Dr. Smith, M.D.  His creatinine level had stabilized in the 2.5-2.8 range.  White had switched to insulin for his diabetes medications.  On examination, White had some edema in his lower extremities.  His lab results from May 20, 2011 showed potassium at 5.1 and creatinine at 2.8.   Dr. Smith assessed that White had stable potassium parameters after the April 30, 2011 dialysis.  Dr. Smith assessed mild edema.  Dr. Smith emphasized staying on a no added salt diet.  R. 498.

On June 15, 2011, White saw Dr. Yu for blood tests and follow up on his kidney disease.  White reported that he felt "ok."  R. 535.  Blood tests showed potassium at 4.4, glucose at 207, GFR of 29, creatinine at 2.36, and BUN at 33.  R. 566, 570.  On examination, White's gait and station were normal; his joints, bones, and muscles were normal; and his reflexes and sensation were normal.  R. 536.  Dr. Yu directed that the lab results be sent to Dr. Smith. R. 537.

On June 21, 2011, White saw Dr. Smith.  White looked well at the appointment.  On examination, White had bilateral edema in the lower extremities.  His potassium was 4.4 and his creatinine was 2.3.  Dr. Smith assessed probable underlying diabetic nephropathy.  R. 497, 979.

On the same day, June 21, 2011, White completed a Function Report—Adult form. R. 223-30.[6] White said he could not work because he became dizzy and weak in his legs and arms. R. 223. White said he spent a typical day doing housework, watching television, and going to the doctor. White said he could take care of his personal care. R. 224. He prepared sandwiches and small meals on a daily basis. He loaded the dishwasher and laundry machines, and made small household repairs. R. 225. He went outside every day and shopped once a week for about an hour. R. 226. He went to the homes of others to socialize. R. 227. He said that his impairments limited his ability to lift, stand, walk, kneel, and climb stairs. He said he finished what he started, and he could follow written and spoken instructions. He said that he got along with authority figures. R. 229.

On July 26, 2011, White saw Dr. Yu for recheck of his diabetes. White said that his blood sugars were running high. White had an abscess behind the right ear that would not heal. R. 532. Blood tests showed potassium at 4.9, glucose at 305, GFR at 36, creatinine at 1.96, and BUN at 29. R. 563-64. On examination, White's gait and station were normal; his bones, joints, and muscles were normal; and his reflexes and sensation

---

[6] White apparently completed the Function Report—Adult forms in connection with his prior application for Disability Benefits.

were normal.  R. 533.  Dr. Yu prescribed Augmentin for the abscess and noted that White's insulin dosage would probably need to be increased.  R. 534

On September 12, 2011, White had blood tests.  The tests showed potassium at 4.8, glucose at 149, GFR at 37, creatinine at 1.9, and BUN at 28.  R. 738-39.

On September 19, 2011, White saw Dr. Ashraf Tamizuddin, M.D., at the Central Illinois Kidney & Dialysis Association.  White reported that he felt well.  He reported occasional ankle swelling.  His lab results showed BUN at 28, creatinine at 1.9, potassium at 4.8, and GFR at 37.  Dr. Tamizuddin assessed stage IV chronic kidney disease with progressive improvement in creatinine after the acute renal failure on April 30, 2011.  Dr. Tamizuddin stated that White was stable from a nephrology perspective.  Dr. Tamizuddin recommended that White lose weight.  R. 496.

On November 2, 2011, White saw Dr. Yu.  White reported that an alarm on his BiPAP machine was going off constantly at night and interfered with his sleep.  White reported that he was having daytime sleepiness.  White reported increasing problems with numbness and tingling in his feet.  He reported increasing problems standing and walking.

He also reported joint pain and stiffness.  R. 528.  On examination, White's gait and station were normal; his joints, bones, and muscles were normal; and his reflexes and sensation were normal.  R. 530.

On November 14, 2011, White prepare a Function Report—Adult form.  R. 247-54.  White said the he could not work because of peripheral neuropathy in his feet, insufficient oxygen, arthritis, and obesity.  R. 247. White said that during a typical day, he prepared meals, napped, got the mail, paid bills online, watched television, occasionally went to doctors' appointments, and occasionally went grocery shopping.  He drove his wife to her appointments.  R. 248.  White said he spent a maximum of 15 minutes preparing meals.  He prepared sandwiches and main courses for dinner.  He also performed minor household repairs and loaded both the dishwasher and the laundry machines.  He spent 30 to 45 minutes a day on these tasks.  R. 249.  White said he could not do yardwork due to pain and mobility issues.  He went shopping twice a month for an hour at a time.  R. 250.

White reported that he went to football and hockey games.  He had to sit at the games.  He visited and went out to dinner with others about six times a year.  He said that his financial situation caused him to stop his social activities.  R. 250-51.

White reported that his impairments limited his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, and complete tasks.  He opined that he could walk for 10-15 minutes before he needed to rest.  He said he could pay attention for an hour. He said that he finished what he started, and he could follow written and spoken instructions.  He got along with authority figures and he could handle stress and changes in routine. R. 252-53.

On November 18, 2011, White saw Jerry S. Reedy, M.D. for a sleep study.  White reported joint pain, joint swelling, muscle weakness, and back pain.  He also said he had numbness and tingling.  On examination, White's neck was supple, and his extremities showed no clubbing, swelling, or cyanosis.  White had no skeletal deformities and no focal weakness or gross sensory deficit.  The sleep study showed that White's sleep apnea had improved.  Dr. Reedy said the pressure setting on the BiPAP machine could be lowered, and White did not appear to need supplemental oxygen anymore.  Dr. Reedy believed the alarm going off at night meant the BiPAP machine needed to be serviced.  White had not had the machine serviced for a few years.  Dr. Reedy's office contacted Pacific Pulmonary to service the BiPAP machine as soon as possible.  R. 495.

On February 13, 2012, White saw Dr. Yu for a follow up on an abscess on his neck.  On examination, White's gait and station were normal; his joints, bones, and muscles were normal; and his reflexes and sensation were normal. Dr. Yu drained an abscess on White's face.  R. 520-21.

On February 14, 2012, White had an ultrasound of his kidneys and bladder.  The ultrasound showed the size of the kidneys and bladder were within normal limits.  The radiologist assessed post-surgical changes to the left kidney and no pelvicaliectasis or nephrolithiasis.[7]  R. 502.  His blood tests showed potassium at 4.9, glucose at 335, BUN at 37, creatinine at 2.1, and GFR at 33.  R. 500-01.

On February 20, 2012, White saw nurse practitioner Heidi M. Sexton, N.P., at the Cancer Care Specialists of Central Illinois, in Decatur, Illinois. R. 504-06.  White previously had no evidence of a relapse of his cancer since the surgery in 2005.  R. 504.  White reported that he was very tired all the time and that it was not uncommon for him to sleep in his chair all day. R. 505.  On examination, White was 69 inches tall and weighed 330

---

[7] Pelvicaliectasis means a dilation of the renal pelvis or the calyces of the kidney. https://www.sciencedirect.com/topics/medicine-and-dentistry/pyelectasis, visited on October 31, 2019. The calyces of the kidney are portions of the kidney that collect urine and drain the urine into the renal pelvis.  Dorland's, at 274. Nephrolithiasis means a diseased condition of renal calculi, or kidney stones. Dorland's at 271, 1241,

pounds.  He had no clubbing, cyanosis, or edema in his extremities.  His lab results showed BUN at 37, creatinine at 2.1, and glucose at 335.  Other lab results were normal.  Sexton determined that White did not present evidence of a relapse of his cancer.  Sexton spent 40 minutes counselling White on diet and exercise.  Sexton said he should return in two years.  R. 506.

On February 21, 2012, White saw Dr. Yu.  Dr. Yu said that White's sugars were out of control due to poor med and diet compliance.  White reported neuropathy and fatigue. He also reported difficulty walking, muscle weakness, and feelings of weakness.  White said his neuropathy medication gabapentin was not working.  R. 513.  On examination, White had no signs of edema in his extremities, his gait and station were normal; his muscles, bones, and joints were normal; his reflexes were normal; and his sensation was intact.  R. 516.

On March 6, 2012, White saw Dr. Yu for a follow up on his abscess on his right cheek.  On examination, White's gait and station were normal; his joints, bones, and muscles were normal; and his reflexes and sensation were normal.  R. 511-12.

On March 7, 2012, White saw nephrologist Dr. Nicolas Forero, M.D., for a second opinion on his kidney disease.  R. 601-03, 607-09.  Dr. Forero

recommended controlling sodium and fluid intakes.  R. 607.  Blood tests showed creatinine of 2.1 and GFR of 33.  Dr. Forero assessed stage III kidney disease.  Dr. Forero recommended low salt diet and other dietary changes.  R. 609.

On April 17, 2012, White had blood tests.  The test showed potassium at 4.9, glucose at 245, GFR at 35, BUN at 36, and creatinine at 2.1.  R. 617.

On May 2, 2012, White saw Dr. Forero.  White reported intermittent edema on his left lower limb.  R. 604.  On examination, White had trace edema on his left lower leg and no clubbing, cyanosis, or evidence of joint deformities.  R. 605.  Dr. Forero stated that White's chronic kidney disease was borderline between stage III and IV.  R. 605.

On May 7, 2012, White saw Dr. Forero.  White reported no joint or back pain and no muscle problems.  White also reported no numbness or tingling.  R. 608.  Dr. Forero assessed chronic kidney disease stage III.  Dr. Forero recommended an 1800 low sodium diet.  R. 609.

On August 27, 2012, White had blood tests.  The tests showed potassium at 4.6, glucose at 422, BUN at 43, creatinine at 2.1 and GFR at 35.  R. 639.

On September 5, 2012, White saw Dr. Forero for a follow up on his stage III kidney disease. White reported no major problems except his sugars were not controlled. Dr. Forero reviewed the August 27, 2012 blood test results. White reported that he did not have shortness of breath, chest pain, or edema in his lower limbs. On examination, he had no clubbing, cyanosis, or edema in the extremities; and no evidence of joint deformity. White weighed 317 pounds. Dr. Forero worried about the weight loss but White said the weight loss was due to diet. R. 599-600.

On January 28, 2013, White had blood tests. The results showed potassium at 4.8, glucose at 242, BUN at 37, creatinine at 2.1 and GFR at 35. R. 632.

More than a year after White's Date Last Insured, on August 26, 2014, White saw Dr. Mohamad Alhosaini, M.D., at the Central Illinois Kidney & Dialysis Association. R. 997-1001. White had gone to the emergency room in June 2014 with slurred speech and an inability to stand. The emergency room staff discharged him with instructions to lose weight and exercise. White's mother expressed concern about a possible stroke. White reported limb weakness and difficulty walking. R. 997. Blood test results showed potassium at 4.6, glucose at 313, BUN at 52, creatinine at 3.4, and GFR at 19. On examination, White had edemas on his

extremities with stasis dermatitis.  Dr. Alhosaini assessed stage IV kidney disease (severe).  R. 1000.

On November 24, 2015, state agency physician Dr. Victoria Dow, M.D., reviewed the information White submitted with his application for Disability Benefits, including the medical records.  Dr. Dow noted that White had the severe impairments of chronic kidney disease and diabetes mellitus. Dr. Dow opined that the record did not contain sufficient evidence to evaluate the claim.  R. 64, 65.

On February 29, 2016, state agency physician Dr. Prasad Kareti, M.D., reviewed the information White submitted with his application for Disability Benefits, including the medical records.  Dr. Kareti noted that Carl White had the severe impairments of chronic kidney disease and diabetes mellitus.  Dr. Kareti opined that the record did not contain sufficient evidence to evaluate the claim.  R. 72-74.

<u>THE ADMINISTRATIVE HEARING</u>

On October 24, 2017, the Administrative Law Judge (ALJ) conducted an evidentiary hearing.  R. 18-60.  White appeared with his counsel. White's wife Rhonda White also appeared, and vocational expert Dr. James Lanier appeared by telephone.  R. 20, 43-44.  White stated that he did not remember many things because of the strokes he suffered. The ALJ

administered oaths to both White and Rhonda White as witnesses. The ALJ asked White to try to answer questions himself, but if he could not, he could ask for help from Rhonda White. R. 22-23. White's counsel confirmed that the record before the ALJ was complete. R. 25.

White testified that he and Rhonda White lived in a one-story ranch style home. White said he had a driver's license but did not drive. R. 30. He weighed 268 pounds on the date of the hearing. R. 38. He finished high school and had on-the-job training thereafter. He did not have any formal post-secondary education or training. R. 30.

White said that he had suffered three strokes. Each affected a different part of his brain. As a result of the strokes, he had difficulty remembering things. White also shuffled his feet and had some difficulty walking. He said the strokes affected both sides of his body equally. R. 30-31. The first stroke occurred in June 2014. White started dialysis on November 23, 2015.

The ALJ stated that he wanted to focus his questions on the period before White's Date Last Insured, June 30, 2013. R. 33. White said that before the first stroke, he could read, write, and perform simple math problems. White said that he stopped working in 2008. He could not remember much else about his abilities before June 30, 2013. R. 35.

The ALJ asked Rhonda White about White's condition before White's Date Last Insured. Rhonda White testified that White was shaky, tired all the time, and had trouble walking. She said he could only walk a few feet and then had to sit down. She said their two sons did work for him. R. 35. Rhonda White said that White had trouble controlling his blood sugar levels. She said his kidney disease also caused problems. R. 36. Rhonda White said that after the dialysis on April 30, 2011, White's kidneys were so bad that he had to stop diabetic medication and became insulin dependent. R. 36, 37.

Rhonda White said that after the 2011 dialysis, White stopped going to football games. She said they had gone to their sons' football games for eight years. She and White stopped going to church because White could not stay awake during services. R. 40-41.

Rhonda White said that White stopped driving because he fell asleep at the wheel. She said that White's sons mowed the yard. R. 36. Rhonda said White could not get a good night's sleep because he had sleep apnea and the alarms on his apnea machine kept going off all the time. R. 41. She also said the doctors' told them that White's diabetes and his kidney disease could also cause fatigue. R. 42. Rhonda White said that White told his doctors about his tiredness every time he went to an appointment.

She said that White usually fell asleep in the exam rooms waiting for the doctors to come in.  R. 42-43.

Rhonda White said White had trouble feeling his feet.  She said he had pain in his feet.  She said that the pain and numbness were a long-term problem. R. 38.  Rhonda White said that before June 30, 2013, White could stand for 45 minutes to an hour.  She said once he sat down, he would fall asleep.  She said he could lift 20 to 25 pounds.  She said he helped with the cooking and loading the dishwasher.  She said he did not do other housework or yardwork.  R. 39-40.

Rhonda White said White had occasional swelling of the ankles.  The doctors told him the swelling could have been caused by his heart or his kidneys.  R. 40.

Dr. Lanier then testified.  Dr. Lanier said that White performed his former work as a construction contractor at the heavy exertional level.  R. 53.  The ALJ asked Dr. Lanier if a person 51 to 55 years of age with a high school education and the ability to perform medium exertional work could perform other jobs in the national economy.  R. 54-55.  Dr. Lanier opined that such a person could perform the jobs of hand packager, with 102,900 such jobs in the national economy; parts picker, with 39,500 such jobs in the national economy.  R. 55.

Dr. Lanier opined that a person could not work if he needed extra breaks in addition to the normal morning, lunch, and afternoon breaks.  Dr. Lanier also opined that a person could not work if he was off task 20 percent of the workday.  R. 56.  Dr. Lanier opined that a person in a workshop would need to be on task 90 to 95 percent of the time and could not be absent more than 1 and ½ days per month.  R. 57.  The hearing then concluded.

## THE DECISION OF THE ALJ

The ALJ issued his decision on March 26, 2018.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that he is disabled regardless of his age, education and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing). 20 C.F.R. §§ 404.1520(d), 416.920(d). If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to his prior work considering his age, education, work experience, and Residual Functional Capacity (RFC). 20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f). If the claimant cannot return to his prior work, then Step 5 requires a determination of whether the claimant is disabled considering his RFC, age, education, and past work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c). The claimant has the burden of presenting evidence and proving the issues on the first four steps. The Commissioner has the burden on the last step; the Commissioner must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. 20 C.F.R. §§ 404.1512, 404.1560(c); <u>Weatherbee v. Astrue</u>, 649 F.3d 565, 569 (7th Cir. 2011); <u>Briscoe ex rel. Taylor v. Barnhart</u>, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that White met his burden at Steps 1 and 2. He had not engaged in substantial gainful activity since his alleged Onset Date of April 30, 2011, and he suffered from the severe impairments of diabetes mellitus, severe obstructive sleep apnea, and obesity prior to his Date Last

Insured of June 30, 2013.  R. 83.  The ALJ found that White's kidney disease and peripheral neuropathy were non-severe prior to the Date Last Insured.  R. 84.  At Step 3, the ALJ found that White's impairments prior to his Date Last Insured did not meet or medically equal a Listing.  R. 84.

At Step 4, the ALJ found that White had the RFC to perform the full range of medium work prior to his Date Last Insured.  R. 85.  The ALJ relied on medical examinations which found normal gait and intact sensation.  The ALJ relied on the sleep studies that showed the BiPAP machine was effective to treat his sleep apnea.  The ALJ also relied on White's 2011 Function Report—Adult forms in which White reported that he went grocery shopping, did light housework, drove, and prepared meals. The ALJ noted that Drs. Dow and Kareti found that the record lacked sufficient information to establish any functional limitations.  The ALJ gave these findings partial weight in light of the other evidence in the record. R. 86.

The ALJ did not give weight to Rhonda White's testimony because it was not consistent with the medical evidence that showed normal gait and intact sensation and the evidence of White's daily activities.  R. 86.

At Step 4, the ALJ found that from the Onset Date to the Date Last Insured, White could not perform his prior relevant work of construction

contractor.  The ALJ found at Step 5 that from the Onset Date to the Last Date Insured, White could perform a significant number of jobs in the national economy.  The ALJ relied on the Medical-Vocational Guidelines (Guidelines).  20 C.F.R. Part 404, Subpart P, Appendix 2.  The applicable Guidelines Rules stated that a person with White's age, education, work experience, and RFC was not disabled.  Guidelines, Rules 203.22 and 203.15.  R. 87-88.  The ALJ concluded that White was not disabled from the Onset Date to the Date Last Insured.  R. 88.

White appealed to the Commissioner's Appeals Council.  On April 9, 2018, White's counsel submitted information taken from the National Kidney Foundation and Mayo Clinic websites regarding kidney disease and the significance of test results for BUN, creatinine levels, and GFR.  R. 1-13.  On October 15, 2018, the Appeals Council denied White's request for review.  The decision of the ALJ then became the final decision of the Defendant Commissioner.  R. 95.  White then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate"

to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).

This Court must accept the findings if they are supported by substantial

evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782

F.2d 79, 82 (7th Cir. 1986).  This Court will not review the ALJ's evaluation

of statements regarding the intensity, persistence, and limiting effect of

symptoms unless the evaluation is patently wrong and lacks any

explanation or support in the record.  See Pepper v. Colvin, 712 F.3d 351,

367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008);

SSR 16-3p, 2016 WL 1119029, at *1 (2016) (The Social Security

Administration no longer uses the term credibility in the evaluation of

statements regarding symptoms).  The ALJ must articulate at least

minimally her analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d

329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical

bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863,

872 (7th Cir. 2000).

The decision of the ALJ is supported by substantial evidence.  The

ALJ's findings of White's RFC before the Date Last Insured is supported by

the medical examinations that found normal gait; normal muscles, joints,

and bones; and normal reflexes and intact sensation.  The decision is also

supported by the two sleep studies that found that White's sleep apnea could be treated by use of a properly working BiPAP machine. The decision was also supported by Drs. Dow and Kareti's opinions that the record did not contain sufficient evidence to establish any functional limitations. White's Function Report—Adult also supported the ALJ's findings that he was more active than represented by Rhonda White's testimony. For example, Rhonda White testified that White did not drive, but White reported that he drove Rhonda White to her medical appointments. R. 248. The RFC determination and the Guidelines supported the ALJ's conclusion that White was not disabled on or before his Date Last Insured.

Rhonda White argues that the ALJ erred in finding at Step 2 that White's kidney disease and peripheral neuropathy were non-severe. Any such error was harmless. Step 2 only sets a threshold requirement that a person must meet to proceed with the rest of the Analysis. The ALJ considers all impairments, whether severe or non-severe, in the remainder of the Analysis. Any error in finding an impairment to be non-severe was harmless as long as the ALJ found that White had at least one severe

impairment.  See Ray v. Berryhill, 915 F.3d 486, 592 (7th Cir. 2019).[8]  In

this case, the ALJ found that White had severe impairments and completed

the Analysis of White's claim.  Any error in finding White's kidney disease

or neuropathy to be non-severe was harmless.

Rhonda White also argues that the ALJ improperly cherry picked the

evidence.  The Court sees no cherry picking.  The ALJ discussed the

material evidence that related to White's functional limitations before the

Date Last Insured.  Rhonda White disagrees with the weight the ALJ gave

certain evidence, but this Court will not reweigh the evidence.  See Jens,

347 F.3d at 212; Delgado, 782 F.2d at 82.  There was no improper cherry

picking of the evidence.

Rhonda White spends significant portions of her brief establishing

that White's lab test results showed that his kidney disease and diabetes

were severe.  The issue at Steps 3 through 5 in the Analysis, including the

RFC determination, is whether the functional limitations of White's illnesses

limited his ability to work.  Rhonda White had the burden to present

evidence to show White's RFC.  White's attorney agreed at the hearing that

the record was complete.  The ALJ could reasonably rely on counsel to

---

[8] White's April 9, 2018, submission to the Appeals Council relates primarily to his claim that his kidney disease was a severe impairment under Step 2.  The April 9, 2018 submission, however, was not part of the record before the ALJ, and so, is not relevant in cases such as this one in which the Appeals Council denied his request for review.  Wolf v. Shalala, 997 F.2d 321, 323 n.3 (7th Cir. 1993).

make the strongest case possible for White.  See Schloesser v. Berryhill, 870 F.3d 712, 721 (7th Cir. 2017); Ray v. Bowen, 843 F.2d 1988, 1006 (7th Cir. 1988).  The blood tests showed that White had uncontrolled diabetes and stage III (and later stage IV) kidney disease.  The blood tests did not show whether White had functional limitations from those diseases.  See Schmidt v. Barnhart, 395 F.3d 737, 746 (7th Cir. 2005) (proof of a diagnosis that might cause functional limitations is not proof that the claimant suffered functional limitations from the diagnosed condition).

Rhonda White also challenges the ALJ's RFC determination.  The record presented failed to prove that his kidney disease and diabetes subjected him to significant functional limitations before the Date Last Insured.  The 2008 and 2011 sleep studies showed that he had significant sleep apnea, which would affect his functional abilities to work.  The sleep studies also showed, however, that a properly functioning BiPAP machine would have been effective in treating his apnea.  This evidence supported the ALJ's RFC determination that White could perform medium work before his Date Last Insured.

White discusses the evidence of his condition after he suffered a stroke in 2014.  This evidence shows a tragic situation which has now led to White's death.  The evidence of this tragedy after White's first stroke in

2014 does not relate to White's functional ability to work more than a year earlier, on or before June 30, 2013, his Date Last Insured. The ALJ did not err by focusing on the relevant evidence of White's condition before the Date Last Insured. The relevant evidence provided substantial evidence to support the ALJ's determination of White's RFC as of his Date Last Insured. See e.g., Shideler v. Astrue, 688 F.3d 306, 311 (7th Cir. 2012) ("We also note that whatever condition the claimant may be in at his hearing, the claimant must establish that he was disabled before the expiration of his insured status . . . to be eligible for disability insurance benefits.").

The Guidelines and the RFC determination provide substantial evidence to support the ALJ's conclusion that White was not disabled prior his Date Last Insured. If a person can perform all or substantially all the demands of an exertional level of work, then the applicable rule in the Guidelines Rule determines whether the person is disabled or not disabled. R 83-11. Here, the ALJ found that White had the RFC to perform all the demands of medium exertional work. The applicable Rule on the Guidelines stated that he was not disabled. That determination is conclusive in this case. SSR 83-11. The ALJ did not err in following the applicable Guidelines Rules.

THEREFORE, IT IS ORDERED the Defendant's Motion for Summary Affirmance (d/e 18) is ALLOWED; Plaintiff's Motion for Summary Judgment (d/e 15) is DENIED; and the decision of the Commissioner is AFFIRMED. THIS CASE IS CLOSED.

ENTER:  December 26, 2019


_s/ Tom Schanzle-Haskins_
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE